[Civ. No. 46210. First Dist., Div. One. Mar. 19, 1982.]

RICHARD PEREIRA et al., Plaintiffs and Appellants, v.
DOW CHEMICAL COMPANY, INC., et al., Defendants and
Respondents.

Counsel

Dodge, Reyes, Brorby, Randall & Titmus, Siegfried D. Hesse, Robert P. Brorby, Cartwright, Sucherman, Slobodin & Fowler, Robert E. Cartwright and Colin C. Kelley for Plaintiffs and Appellants.

Hall, Henry, Oliver & McReavy, W. Martin Tellegen, Lee H. Cliff, Winingham, Roberts & Rogie, John L. Winingham, Shelley A. Kramer, Moore, Clifford, Wolfe, Larson & Trutner, Clark J. Burnham, J. Jay Schnack, Pillsbury, Madison & Sutro, Noble K. Gregory, Noel J. Dyer and William Fisher for Defendants and Respondents.

Opinion

LEVINS, J.*—Plaintiffs Richard Pereira and Marlene Pereira, his wife, appeal from orders granting summary judgments in favor of the various defendants in an action to recover damages for personal injuries for permanent, severe kidney disorder sustained by Richard Pereira and for his wife's attendant loss of consortium. Both plaintiffs sought to recover against Dow Chemical Company, Inc. (Dow), as producer of DER 599; General Mills Chemical, Inc. (General), as distributor of GenEpoxy 190; Central Solvents & Chemicals Co. (Central), as distributor of methylene chloride; and E. I. du Pont de Nemours & Company (du Pont), as producer of MOCA. Plaintiffs pled causes of action in strict liability, negligence, and implied warranty with respect to the manufacture, sale, distribution and use of certain chemical products which were used at Richard's place of employment.

On April 6, 1978, and September 7, 1978, the superior court filed its orders granting motions for summary judgment. The court found that no disputable issue of fact existed and that the causes of action asserted were barred by the statute of limitations. The present appeal followed denial of a motion for a new trial.

A review of the factual background shows that Richard Pereira began working for Darrel Finck at Mid Coast Plastic Company (Midcor) from 1970 continuously, except for 10 days in the hospital for diagnostic tests in 1974, until July 29, 1975, when he was terminated. On

*Assigned by the Chairperson of the Judicial Council.

January 27, 1974, in the course and scope of his employment, he was pouring DER 599 into a drum of GenEpoxy Resin 190. While so pouring, some 599 spilled onto his pants below the protective apron he was wearing. The chemical soaked through his pants and felt like warm water on the skin. He then used methylene chloride, a solvent, to clean off the 599. He continued to wear the pants until he completed the shift and, at home, asked Mrs. Pereira to take particular care in cleaning the pants. He did not feel any physical discomfort and reported the incident to his employer the following day. The manner in which he was mixing the chemicals on January 27, 1974, was a standard procedure at Midcor which he had been performing for three or four years.

Approximately two weeks after the spill a rash about the size of a quarter appeared on each of his legs between his knees and ankles. As he knew, a coemployee had had a similar rash from DER and it had disappeared in a few weeks. Richard's rash did not cause any physical discomfort, and it disappeared within a few weeks without medical treatment.

Sometime after the rash disappeared, he noticed a swelling of his ankles, and, on March 9, 1974, while consulting Dr. William Kosch concerning a vasectomy, asked the doctor about his swollen feet and referred to the spill incident. He was not told the cause of the swelling, and on March 15, 1974, the vasectomy was performed in Kosch's office. No notation was made in the doctor's records with respect to Mr. Pereira's legs. On March 23, 1974, he was seen by Kosch regarding the vasectomy and the doctor's records noted that the swelling extended to the knees. On March 28, 1974, he saw Kosch solely about the leg problem and Kosch scheduled him for hospitalization on April 1, 1974, for an examination relating to a suspected kidney problem. There is no indication that Kosch discussed with Mr. Pereira the possible causes of his swollen legs.

Between March 9 and April 7, 1974, Kosch discussed with Mr. Pereira the possible causal connection between 599 and a nephrotic syndrome. On April 9, 1974, Kosch prepared a "Doctor's First Report of Work Injury" which contained a diagnosis relating the nephrotic syndrome to 599.

Also between March 9 and April 1, 1974, Mr. Pereira, for the first time, read a label on a DER 599 drum: the only warning thereon related to possible skin irritation. From April 1, 1974, through April 7,

1974, he was hospitalized for tests relating to a suspected nephrotic syndrome and a renal biopsy was performed on April 3, 1974, by Dr. Donald Rice, a kidney specialist consulted by Kosch. Dr. Rice's diagnosis, upon discharge, was nephrotic syndrome, toxic, suspected.

On April 11, 1974, Dr. Rice discussed with Mr. Pereira "the likelihood of possible toxic effects from the chemicals as well as the probable immunologic aspects of his disease. [He] told him that signs of both types of illness were present . . . ." On April 22, 1974, Dr. Kosch wrote to Midcor's insurance carrier that the cause of the kidney disorder was "most likely toxic, having been caused by the epoxy resin Dow #599," but this letter was not mailed until January 28, 1975. Plaintiffs did not know of the contents thereof until Dr. Kosch's records were subpoenaed for the workmen's compensation proceeding, which commenced in late July 1975, less than six months before the complaint herein was filed.

Dr. Rice never told Mr. Pereira that the chemical spill was the cause of the nephrotic syndrome and on April 11, 1974, upon discharge from the hospital, Dr. Rice advised Pereira to return to work "avoiding intimate contact with the chemicals for the moment was all that would be necessary." Mr. Pereira returned to the same work he had been performing. On June 6, 1974, Dr. Rice completed his first report of work injury, wherein he noted a diagnosis of "nephrotic syndrome, toxic, suspected." He did not suggest any possible toxic agent nor did he tell Mr. Pereira then, or at any time, that 599, or any other chemical, was the cause of his kidney problem.

By June 5, 1974, Dr. Kosch noted that the swelling had extended to Mr. Pereira's waist. At trial Mrs. Pereira testified that once the swelling extended to her husband's genitals, their sexual intercourse was completely, or almost completely, interrupted. She also noted a gradual change in her husband's attitudes and activities from mid-1974; he was getting very fatigued and irritable and their sex life began to disintegrate.

On July 16, 1975, a workmen's compensation claim was filed. Up to that time, plaintiffs had not seen any medical files. Mr. Pereira was admitted to Stanford University Hospital in late July 1975 for further tests. Dr. Kosch suspected that the epoxy resin 599 had been readily absorbed through the skin and discussed with Mr. Pereira the possible causal connection with his kidney condition. Dr. Rice also discussed with Mr. Pereira the likelihood of possible causal connection between

the 599 resin and the nephrotic syndrome. Finally, Dr. Rex L. Jamison, head of the division of nephrology at Stanford Hospital and an associate professor of medicine, noted that: "In my view, the historical circumstances are strongly suggestive of a cause and effect relationship between the spillage of the epoxy resin and the development of this patient's renal disease."

No one at Stanford, however, *told* Mr. Pereira what his problem was, or what was causing it, except that it had to do with his kidneys. The complaint was filed on January 14, 1976.

*Issues*

I. Were summary judgments as to each defendant properly granted on the issue of causation?

II. Were plaintiffs' causes of action barred by the statute of limitations?

I

■ We are of the opinion that there are material factual issues on causation which require the trial process. Dow manufactures and distributes DER 599 and DER 331, the latter of which is purchased by General and resold under the name of GenEpoxy 190. Both of these products are liquid epoxies, used by Midcor in the manufacture of airplane galley doors, and were delivered to Midcor in 55-pound metal drums. DER 599 is a reaction product of epichlorohydrin and brominated phenol and Gen 190 (DER 331) is a reaction product of epichlorohydrin and bisphenol. Both epichlorohydrin and phenol can be toxic, irrespective of the route of exposure—skin contact or inhalation of vapors—and epichlorohydrin has cumulative potential.

Central distributed methylene chloride to Midcor. This is a chemical solvent manufactured by Dow for use as a paint, metal, and carbon remover. The vapor from that liquid chemical compound is harmful and Dow's material safety data sheet for 599 suggests using methylene chloride to clean up a 599 spill. Methylene chloride was also one of the chemicals to whose vapors Mr. Pereira was exposed during his employment. Dr. Donald Whorton's declaration allows that a nephrotic syndrome may be causally related to chronic solvent exposure. He ex-

amined Mr. Pereira on May 18, 1977, and is a licensed physician with a practice limited to internal medicine and occupational diseases.

Du Pont manufactured and distributed MOCA, and this chemical was used at Midcor during plaintiff's employment but was not being used by Mr. Pereira on the evening of the 599 spill. Du Pont's own testing established that MOCA could produce cyanogenic effects if absorbed by the body in sufficient quantities. There is no indication as to whether du Pont conducted tests with respect to a possible causal relationship between MOCA and kidney damage.

Plaintiffs' causal theories are not limited to the spill of 599 but include the cumulative effect of exposure to the vapors of the chemical products manufactured or distributed by defendants and used at Midcor during Mr. Pereira's employment from 1970 until July 29, 1975.

As we said in *Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 661-662 [150 Cal.Rptr. 384]: "Inasmuch as this case reaches us on appeal from a summary judgment in favor of defendant, we need only determine whether there is a reasonable *possibility* that plaintiff may be able to establish its case. When the moving party is the defendant, he must conclusively negate a necessary element of plaintiff's case or establish a complete defense, and thereby demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial." (See also Code Civ. Proc., § 437c; *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; *McCreery* v. *Eli Lilly & Co.* (1978) 87 Cal.App.3d 77, 81 [150 Cal.Rptr. 730].) "'The summary judgment procedure is drastic and should be used with caution so that it does not become a substitute for an open trial.... "[D]oubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion."'" (*Tresemer, supra*, p. 662; see *Wozniak* v. *Peninsula Hospital* (1969) 1 Cal. App.3d 716, 722 [82 Cal.Rptr. 84].)

Here, the plaintiffs allege that Dow's 599, GenEpoxy 190, Central's methylene chloride and du Pont's MOCA, and their containers, were defective in manufacture, design, label, and warning; that the chemicals were toxic and poisonous; that they were used in conjunction with one another; that they were impliedly warranted to be safe for their intended use; that the chemicals and containers necessarily created an unreasonable risk of bodily harm; that the chemical contents of the containers sold to Midcor were defective in that they did not contain

spigots or adequate warnings of the hazardous conditions involved in their use, and that as a result, Mr. Pereira suffered chronic renal failure and Mrs. Pereira a loss of consortium.

Under the circumstances, it is not plaintiffs' duty to identify which of the vapors caused or contributed to the chronic renal failure but, rather, it is the duty of the defendants who supplied Midcor with their products to prove the contrary. *Summers* v. *Tice* (1948) 33 Cal.2d 80, 85-86 [199 P.2d 1, 5 A.L.R.2d 91], states that "'The real reason for the rule that each joint tortfeasor is responsible for the whole damage is the practical unfairness of denying the injured person redress simply because he cannot prove how much damage each did, when it is certain that between them they did all; let them be the ones to apportion it among themselves.'" (See also *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 600 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061].)

Therefore, the orders granting summary judgments on the issue of liability (causation) are fatally defective, and the judgments based thereon must be reversed unless the record establishes the defense of the statute of limitations.

## II

The statute of limitations did not begin to run until plaintiffs were aware, or should have been aware, of their causes of action. ■ The general rule is that the one-year statute of limitations of Code of Civil Procedure section 340, subdivision (3) is applicable to product liability cases involving personal injuries, and that the period commences to run when the cause of action accrues, which normally means when the wrongful act takes place. (*G.D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 25 [122 Cal.Rptr. 218].) However, this is subject to the rule of discovery, which provides that "the cause of action does not accrue until the plaintiff knows, or should know, all material facts essential to show the elements of that cause of action." (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 190 [98 Cal.Rptr. 837, 491 P.2d 421] (economic injury attending attorney's malpractice).)

This rule of discovery applies to personal injuries based on products liability. In *G.D. Searle & Co., supra*, 49 Cal.App.3d 22, 25, involving the use of oral contraceptives, the court noted the exception "when the pathological effect occurs without perceptible trauma and the victim is

'blamelessly ignorant' of the cause of injury; in that case, the statute of limitations does not begin to run until the person knows or, by the exercise of reasonable diligence, should have discovered the cause of injury."[1] The court in *Velasquez* v. *Fibreboard Paper Products Corp.* (1979) 97 Cal.App.3d 881 [159 Cal.Rptr. 113] was faced with an insulation worker disabled by asbestosis, a progressive and serious disorder which would cause pain and debility in the future. It said (p. 888), "the stipulated facts give cause to question whether appellant was informed that he had a progressive and serious disorder which would cause him pain and debility in the future." Under the facts of that case, diagnosis was not synonymous with discovery.

■ Where the rule of discovery applies, the issue of whether discovery of the cause of action was reasonably delayed is a question of fact. The question becomes a matter of law only where reasonable minds can draw only one conclusion from the proffered evidence. (*Wozniak* v. *Peninsula Hospital, supra,* 1 Cal.App.3d 716, 725 (brain damage during eye surgery); see also *Martinez-Ferrer* v. *Richardson-Merrell, Inc.* (1980) 105 Cal.App.3d 316 [164 Cal.Rptr. 591] (16 years between ingestion of a drug and discovery of cataracts).) Finally, whether due diligence has been used to discover a cause of action is also a question of fact. (See *Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 886 [112 Cal.Rptr. 540, 519 P.2d 588] (improper diagnosis); *Baker* v. *Beech Aircraft Corp.* (1974) 39 Cal.App.3d 315, 323 [114 Cal.Rptr. 171, 91 A.L.R.3d 981] (fraudulent concealment regarding air crash).)

■ Applying the foregoing principles to the facts before us, we note that the spill of January 27, 1974, did not involve any perceptible trauma. Moreover, the rash disappeared in approximately two weeks and plaintiffs did not see any medical records until November 1975, shortly before the complaint was filed. No medical person told them that the kidney problem was caused by the spill. A specialist, Dr. Rice, told Mr. Pereira to return to work but to avoid intimate contact with the chemicals temporarily. This is not a record which requires or justifies a conclusion, as a matter of law, that plaintiffs were or should have been aware that the kidney problem was only caused by the spill. Indeed, the earliest indication in the record that a component of DER 599 and

---

[1]*Coots* v. *Southern Pacific Co.* (1958) 49 Cal.2d 805, 809-810 [322 P.2d 460] (continuing exposure of skin to chemical solution in employment); *Dujardin* v. *Ventura County Gen. Hosp.* (1977) 69 Cal.App.3d 350, 355 [138 Cal.Rptr. 20] (use of IUD device); *Warrington* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 564, 567-568 [80 Cal.Rptr. 130] (ingestion of prescribed drugs).

GenEpoxy 190 can be both nephrotoxic and cumulative in effect was when Valley Memorial Hospital records were subpoenaed in connection with the application for workmen's compensation benefits in July 1975. The complaint was filed within six months of that date. Therefore, it was improper to conclude, as a matter of law, that plaintiffs acted unreasonably or without due diligence in pursuit of their claims.

The trial court erred in granting its orders for summary judgments in favor of the defendants. There are factual issues to be resolved by a jury, both as to causation and as to when plaintiffs knew or should have been aware of the industrial causation of Mr. Pereira's kidney condition.

The summary judgments are, and each of them is, reversed.

Elkington, Acting P. J., and Newsom, J., concurred.