[No. A060263. First Dist., Div. One. Jan. 31, 1995.]

ROBERT LINEAWEAVER et al., Plaintiffs and Appellants, v.
PLANT INSULATION COMPANY, Defendant and Respondent.

1412

## COUNSEL

Daniel U. Smith, Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Harry F. Wartnick and Audrey A. Smith for Plaintiffs and Appellants.

Charles Bond, Heather McKee, Charles Marx, Jackson & Wallace, John Wallace, Allan Gutsche, Carol Solfanelli, Lynberg & Wakins, Norman J. Watkins and Ruth Segal for Defendant and Respondent.

## OPINION

**STRANKMAN, P. J.**—Appellants Robert Lineaweaver, Floyd King, and Ralph Ward brought actions against numerous asbestos suppliers seeking to recover for personal injuries sustained from their repeated exposure to asbestos insulation products. A bifurcated trial on the separate issues of damages and liability proceeded against a lone defendant, respondent Plant Insulation Company (Plant). A jury found each appellant to have suffered

damages, but the trial court granted respondent's nonsuit motion on the issue of liability, concluding that appellants failed to present sufficient evidence of exposure to respondent's product. We also find insufficient evidence that appellants King and Ward were exposed to Plant-supplied asbestos and affirm judgment against them. However, we reverse judgment as to appellant Lineaweaver upon finding sufficient circumstantial evidence to support a reasonable inference of exposure.

## TRIAL COURT PROCEEDINGS

Appellants filed separate actions in 1989 against 41 asbestos suppliers for personal injuries sustained from their occupational exposure to asbestos. These three actions and others were consolidated for trial, and then trial bifurcated on the issues of injury and liability. Trial proceeded against a single defendant, respondent Plant, an asbestos insulation contractor and distributor.

The first phase of the trial concluded with the jury finding that appellants suffer from the respiratory affliction of asbestosis, marked by tissue scarring from the inhalation of asbestos fibers. The second phase of the trial was directed to determining liability. This latter phase of trial ended in a nonsuit judgment entered in favor of Plant, upon the trial court's conclusion that appellants failed to present sufficient evidence that their injuries were caused by exposure to Plant distributed products.

## STATEMENT OF FACTS

Beginning in 1948, Plant was the exclusive Northern California distributor of Fibreboard insulation products, marketed under the Pabco trademark. Plant was primarily an insulation contractor that installed Pabco, but Plant also sold Pabco directly to other businesses.

Appellant Lineaweaver claims exposure to Pabco at the Standard Oil (now Chevron) refinery in Richmond, California. Lineaweaver worked at the refinery for 34 years, from 1950 to 1984, as a laborer and journeyman boilermaker/welder. His duties as a laborer included cleaning up asbestos debris and ripping out old insulation. As a boilermaker/welder, he worked near insulators and other tradespeople who produced asbestos dust. Plant was a significant supplier of insulation products at the Standard Oil refinery. According to one witness, Plant performed about 50 percent of the insulation work done at the refinery in the 1960's. Plant-supplied Pabco was also used as substituted "fill-in" by another major insulation contractor at the refinery when its own insulation supplies ran out.

Appellant King worked as a laborer at Todd Naval Shipyard (Todd) in Alameda and San Francisco, California, from 1965 until 1986. King also worked periodically at Willamette Shipyard (Willamette) from 1966 to 1968, splitting his time with work at Todd. As a laborer, King swept and removed insulation debris from the shipyards and aboard ships during repairs. Occasionally, he removed old insulation. Plant was a prominent insulation contractor at Todd in the years before King's employment in 1965 and in the years after Fibreboard stopped using asbestos in its Pabco insulation, which was 1971. However, in the critical years of 1965 to 1971, a different insulation contractor, Owens-Corning Fiberglas Corporation (OCF), had an exclusive arrangement with Todd. In that time period, Pabco or other products would be used on ships at Todd only as incidental "fill-in" on perhaps one out of every three or four ships. On these jobs, the substituted products, or "fill-in," would account for about 10 to 15 percent of the insulation materials used. Likewise, Pabco was used only as "fill-in" at Willamette in the 1960's and 1970's.

Appellant Ward was a merchant marine from 1968 to 1990, where he worked almost exclusively in ships' engine rooms performing a variety of jobs, from watch fireman to engineer. In his various capacities, Ward assisted in boiler work, cleaned up insulation debris, and occasionally removed asbestos insulation from pipelines. His claim of exposure to Pabco relies on Pabco's use as a "fill-in" at San Francisco Bay Area shipyards where ships he manned were repaired.

## DISCUSSION

We look no further than established California law and long-standing tort principles to resolve the single issue put to us: was there evidence of sufficient substantiality to support a jury finding that asbestos supplied by respondent Plant was a cause of appellants' injuries?

### A. *Causation as an Element of Negligence*

Actionable negligence requires a showing that the defendant owed the plaintiff a legal duty of care, that the defendant breached that duty, and that the breach caused the plaintiff injury. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207].) Here, we are concerned with the element of causation and, in particular, the cause in fact component of that element. Causation, as an element of negligence, includes both cause-in-fact and proximate-legal causation: ". . . the former reflects the necessity of a sufficient factual nexus between the negligent conduct and the injury while the latter represents the legal

determination encompassing all the ill-defined considerations of policy which go to limit liability once cause in fact has been established." (*Lopez* v. *McDonald's Corp.* (1987) 193 Cal.App.3d 495, 515, fn. 17 [238 Cal.Rptr. 436].)

## B. *The Substantial Factor Test*

■ The "substantial factor" standard is used for cause-in-fact determinations. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1044, fn. 2, 1052, fn. 7 [1 Cal.Rptr.2d 913, 819 P.2d 872].) Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury. (*Id.*, at pp. 1052-1053; Rest.2d Torts, § 431, subd. (a), p. 428; BAJI No. 3.76 (8th ed. 1994 bound vol.).) The substantial factor standard generally produces the same results in cases as does the "but for" rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred but for that conduct. (*Mitchell, supra*, at p. 1053; Prosser & Keeton on Torts (5th ed. 1984) § 41, p. 266.) The substantial factor standard has gained favor as a clearer rule of causation and one which subsumes the "but for" test while reaching beyond it to address other situations, such as independent or concurrent causes. (*Mitchell, supra*, at pp. 1052-1053; Prosser & Keeton on Torts, *supra*, § 41, pp. 266-268.)

"Substantial factor" has not been judicially defined, and some think it "neither possible nor desirable to reduce it to any lower terms." (Prosser & Keeton on Torts, *supra*, § 41, p. 267.) However, it has been suggested that a force which plays only an "infinitesimal" or "theoretical" part is not a substantial factor. (*People* v. *Caldwell* (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274].) But the word "substantial" should not be weighted too heavily. The substantial factor standard, formulated to aid plaintiffs as a broader rule of causality than the "but for" test, now has been embraced by defendants where their conduct is a "but for" cause of plaintiff's injury but is nevertheless urged as an insubstantial contribution to the injury. (Prosser & Keeton on Torts (5th ed., 1988 supp.) § 41, pp. 43-44.) Misused in this way, the substantial factor test "undermines the principles of comparative negligence, under which a party is responsible for his or her share of negligence and the harm caused thereby." (*Mitchell* v. *Gonzales, supra*, 54 Cal.3d at p. 1053.)

## C. *Components to Proving Causation*

Generally, it falls to a plaintiff to establish causation. (*Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 597 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], cert. den. (1980) 449 U.S. 912 [66 L.Ed.2d 140, 101 S.Ct. 285].) ■ In the context of asbestos litigation, a plaintiff must demonstrate exposure to a defendant's product and biological processes from the

exposure which result in disease. The concurring opinion proposes shifting the burden of proving causation as to this second element alone, with the plaintiff still expected to prove exposure as a "threshold issue," but then seems to conflate the causation elements of exposure and biological causality when it suggests that the plaintiff must prove exposure "extensive enough to produce substantial harm." (Conc. opn., *post*, pp. 1424, 1428-1429.) We agree that a plaintiff rightly bears the burden of proving exposure to a particular defendant's product.[1] However, we conclude that the proper analysis is to ask whether the plaintiff has proven exposure to a defendant's product, of whatever duration, so that exposure is a possible factor in causing the disease and then to evaluate whether the exposure was a substantial factor.

D. *Proving Asbestos Exposure to Be a Substantial Factor In Causing Injury*

In evaluating whether exposure was a substantial factor in causing asbestos disease, the standard should be the same as used in other negligence cases: is there a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to plaintiff's injury.[2] (*Bromme* v. *Pavitt* (1992) 5 Cal.App.4th 1487, 1498 [7 Cal.Rptr.2d 608]; Rest.2d Torts, § 433B, com. a, p. 442.) While there are many possible causes of any injury, " '[a] possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury.' " (*Ibid.*)

■ Many factors are relevant in assessing the medical probability that an exposure contributed to plaintiff's asbestos disease. Frequency of exposure, regularity of exposure, and proximity of the asbestos product to plaintiff are certainly relevant, although these considerations should not be determinative in every case. (Cf. *Lohrmann* v. *Pittsburgh Corning Corp.* (4th Cir. 1986) 782 F.2d 1156, 1162-1163 [adopting "frequency-regularity-proximity" test as de minimis standard of causation].) Additional factors may also be

---

[1] We recently affirmed a partial directed verdict where plaintiff failed to prove exposure to an asbestos insulation distributor's product. (*Dumin* v. *Owens-Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650 [33 Cal.Rptr.2d 702].)

[2] This standard is not a new approach to causation in asbestos cases, as the concurring opinion suggests. (Conc. opn., *post*, pp. 1421-1422) In any negligence case, the plaintiff must present evidence from which a reasonable fact finder may conclude that defendant's conduct probably was a substantial factor in bringing about the harm. (Rest.2d Torts, § 433B, coms. a, b, pp. 442-443.) Our reference to "medical" probability, drawn from medical malpractice cases, is no more than a recognition that asbestos injury cases (like medical malpractice cases) involve the use of medical evidence.

significant in individual cases, such as the type of asbestos product to which plaintiff was exposed, the type of injury suffered by plaintiff, and other possible sources of plaintiff's injury. (*Lockwood* v. *AC & S, Inc.* (1987) 109 Wn.2d 235 [744 P.2d 605, 613]; see Rest.2d Torts, § 433 [listing considerations important in determining causation].) "Ultimately, the sufficiency of the evidence of causation will depend on the unique circumstances of each case." (744 P.2d at p. 613)

■■■ Appellants argue that we should depart from traditional tort principles and shift the burden of proving causation to defendants in asbestos litigation. But, contrary to appellants' suggestion, requiring a plaintiff to demonstrate a reasonable medical probability that his injury resulted from exposure to a defendant's asbestos product does not impose an onerous burden of proof upon plaintiffs. Plaintiffs are free to demonstrate that a particular asbestos disease is cumulative in nature, with many separate exposures contributing to their injuries. Prima facie evidence of causation may consist of proof that exposure to a particular defendant's asbestos product aggravated the character or extent of plaintiff's disease. (See Rest.2d Torts, § 432, com. a, p. 430.) Defendants would not escape liability simply because the precise contribution of each exposure to the disease cannot be determined, but they would be entitled to limit damages assessed against them if they proved the harm was capable of apportionment among them. (*Johns-Manville Products Corp.* v. *Superior Court* (1980) 27 Cal.3d 465, 477-478, fn. 11 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758]; *Bromme* v. *Pavitt, supra,* 5 Cal.App.4th at p. 1499; Rest.2d Torts, § 433B, subd. (2), p. 441.) In short, we believe existing tort rules are competent to adjudicate factual causation in asbestos cases, and find no need to create new rules of doubtful efficacy and justness.

E. *Burden Shifting Under a Theory of Alternative Liability*

Appellants advocate, and the concurring opinion endorses, an extension of the alternative liability theory to shift the burden of proving causation to asbestos suppliers. (*Summers* v. *Tice* (1948) 33 Cal.2d 80, 84-88 [199 P.2d 1, 5 A.L.R.2d 91].)[3] However, the great majority of courts which have considered the issue have refused to extend the alternative liability doctrine to asbestos cases. (See *Goldman* v. *Johns-Manville Sales Corp.* (1987) 33 Ohio St.3d 40 [514 N.E.2d 691, 697-698] [collecting cases].) As we ourselves have earlier intimated, the extension of *Summers* to asbestos

---

[3]The issue of whether asbestos suppliers should be subjected to alternative liability, or a variation of the theory, is raised in a case presently before our Supreme Court. (*Coughlin* v. *Owens-Illinois, Inc.* (1993) 36 Cal.App.4th 165 [27 Cal.Rptr.2d 214], review granted Apr. 21, 1994 (S037837).)

cases is troublesome. (*Dumin* v. *Owens-Corning Fiberglas Corp.*, *supra*, 28 Cal.App.4th at p. 657.)

In *Summers*, the originator of the alternative liability doctrine, plaintiff was injured by a single shot while hunting with two companions who each negligently fired their shotguns in plaintiff's direction at about the same time. (*Summers* v. *Tice*, *supra*, 33 Cal.2d at pp. 82-83.) There was a 50 percent chance that one of the two negligent hunters who fired bird shot in plaintiff's direction was responsible for the injury he sustained and, rather than demand that plaintiff prove which one of the two tortfeasors caused the injury, the court shifted the burden to each tortfeasor either to prove that he had not caused the injury or to bear joint liability in the absence of counter proof. (*Id.*, at pp. 84-88.)

Unlike *Summers*, there are hundreds of possible tortfeasors among the multitude of asbestos suppliers. As our Supreme Court has recognized, the probability that any one defendant is responsible for plaintiff's injury decreases with an increase in the number of possible tortfeasors. (*Sindell* v. *Abbott Laboratories*, *supra*, 26 Cal.3d at pp. 602-603.) When there are hundreds of suppliers of an injury-producing product, the probability that any of a handful of joined defendants is responsible for plaintiff's injury becomes so remote that it is unfair to require defendants to exonerate themselves. (*Id.*, at p. 603.) The probability that an individual asbestos supplier is responsible for plaintiff's injury may also be decreased by the nature of the particular product. Asbestos products have widely divergent toxicities. (*Mullen* v. *Armstrong World Industries, Inc.* (1988) 200 Cal.App.3d 250, 256 [246 Cal.Rptr. 32].) Unlike the negligent hunters of *Summers*, all asbestos suppliers did not fire the same shot. Yet, under a burden-shifting rule, all suppliers would be treated as if they subjected plaintiff to a hazard identical to that posed by other asbestos products.

We agree with our Supreme Court that it is unfair to subject product suppliers to joint and several liability upon only a remote possibility that any of a handful of joined defendants caused plaintiff's injury. (*Sindell* v. *Abbott Laboratories*, *supra*, 26 Cal.3d at p. 603.) We recognize that plaintiffs sometimes have difficulty in proving causation in asbestos litigation and are not insensitive to their claims that it would be unfair to deny them a remedy for the wrong inflicted upon them. But it is the wrongdoer who caused the harm that should bear the cost, and it serves no justice to fashion rules which allow responsible parties to escape liability while demanding others to compensate a loss they did not create.

The concurring opinion endorses the view of *Menne* v. *Celotex Corp.* (10th Cir. 1988) 861 F.2d 1453, 1467, that "[s]hifting the burden [of proof] seems

at least as fair where *some*, if not all, defendants are shown to have contributed *some* of the harm as where only *one* of them is thought to have caused *all* the harm: in the former situation a liable defendant will be shown at least to have actually caused *some* harm; in the latter a defendant who is entirely innocent of causing any of the . . . injury can be found liable." (Conc. opn., *post*, p. 1427.) But this reasoning simply begs the causation question. If plaintiff had, as the *Menne* court assumes, shown that some defendants caused the harm, then plaintiff would have proven causation against some defendants and would have no need for a burden-shifting rule against all defendants. In truth, *Menne* and the concurring opinion would require every joined defendant to exonerate itself upon nothing more than plaintiff's showing of exposure to defendants' asbestos products, some of which *may* have caused harm. Again, we return to probabilities and, as discussed, the probability that a particular asbestos supplier joined as a defendant has caused a plaintiff's injury is often remote given the hundreds of possibly responsible parties and the unequal hazards posed by different asbestos products.

..Moreover, there is no compelling evidence that the difficulties in proving causation are so significant as to warrant a departure from traditional tort rules. The history of asbestos litigation has demonstrated the plaintiffs' ability to prove their cases at trial. In fact, this case itself demonstrates a plaintiff's ability to prove causation without need of a burden-shifting rule. Guided by existing tort principles alone, we conclude that the judgment of nonsuit against plaintiff Lineaweaver must be reversed. As for plaintiffs King and Ward, we find insufficient evidence of any exposure to Plant supplied Pabco and therefore conclude that nonsuit was properly granted against them.

F. *Appellants' Proof of Causation*

*Appellant Lineaweaver*

Appellant Lineaweaver, who suffers from asbestosis, presented sufficient evidence of exposure to Plant supplied asbestos products, as follows: (1) Plant was the exclusive distributor in Northern California of Pabco asbestos insulation products beginning in 1948; (2) Lineaweaver worked at the Standard Oil refinery from 1950 to 1984, repeatedly working with and around asbestos insulation; (3) Lineaweaver worked throughout the sprawling refinery which has insulation over about two-thirds of its pipes and much of its equipment; (4) Lineaweaver saw boxes of Pabco products at the refinery; (5) Plant was a significant supplier of asbestos products, performing about 50 percent of the insulating work at the refinery in the 1960's; (6)

another major insulation contractor used Pabco and another product as "fill-in" supplies which constituted 10 to 15 percent of the refinery's insulation installed by that contractor.

While there was no direct evidence that Lineaweaver was exposed to Plant-supplied Pabco, the circumstantial evidence was sufficient to support a reasonable inference of exposure. Unlike *Dumin* v. *Owens-Corning Fiberglas Corporation, supra,* 28 Cal.App.4th 650, in which we found insufficient evidence of exposure to a particular asbestos product, plaintiff has established that defendant's product was definitely at his work site and that it was sufficiently prevalent to warrant an inference that plaintiff was exposed to it during his more than 30 years of working with and around asbestos throughout the refinery.

As for biological causation, a physician expert in occupational medicine concluded that Lineaweaver's exposure to Pabco products was "a very substantial factor" in causing Lineaweaver's asbestosis. The physician, Dr. Richard Cohen, even opined that it is more likely than not that Lineaweaver would have developed asbestos-related disease from the exposure to Pabco products alone. Plant disputes the validity of these opinions as based on unsupported quantification in "fiber-years" of Lineaweaver's exposure to Pabco. But the opinions of plaintiffs' experts and an inference of Pabco exposure as a substantial factor in contributing to Lineaweaver's asbestosis may be drawn from evidence independent of Dr. Cohen's quantification methodology. As discussed above, Lineaweaver presented evidence of exposure to Plant-supplied Pabco on a regular basis over more than 30 years of working with and near asbestos insulation products. Lineaweaver was exposed to pipe covering and block insulation which is friable and "very powdery," and created visible dust reminiscent of a "snow storm." While there are other possible sources of Lineaweaver's asbestosis given his exposure to many different asbestos products, it is significant that Pabco products were prominent and prevalent at his work site. Viewing this evidence in Lineaweaver's favor, it was sufficient to support a jury's inference that exposure to Pabco products was a substantial factor in causing Lineaweaver's asbestosis.

### Appellants King and Ward

In contrast, appellants King and Ward failed to present sufficient evidence to permit the inference that they were exposed to Pabco products. ■ Ward never demonstrated that Pabco products were aboard the ships he manned. Ward testified that he worked in the engine room of 60 ships during his tenure with the merchant marine. He could not identify Pabco as ever

being aboard any of those ships. Nor did any other witness testify to the presence of Pabco products on those ships. Ward did offer the testimony of two OCF insulators, who worked, at largely unspecified times, on no more than 20 percent of the sixty ships to which Ward was assigned. The insulators described a general practice of using Pabco and other insulation products as "fill-in" when OCF supplies ran out. But this testimony only shows that Pabco may have been minimally used as a "fill-in" at uncertain times aboard one out of every three or four of the approximately one hundred ships serviced by each of the OCF insulators. There is simply no evidence that Pabco asbestos products were actually used, or even probably used, on any of the ships at the time Ward was serving aboard them.

■ Appellant King also places unwarranted reliance upon the testimony of the OCF insulators recounting a general practice of using Pabco or other insulation products as incidental "fill-in" on ships along the San Francisco Bay waterfront. The evidence fails to show that King was exposed to Pabco, and instead creates a dwindling stream of probabilities that narrow into conjecture. Pabco was only one of four products used as "fill-in," although it was one of the two products most commonly used. "Fill-in" was not used upon every ship, but upon only one out of three or four ships of the one hundred ships serviced by the testifying insulators, and "fill-in" constituted no more than 15 percent of the insulation materials used. Even accepting this evidence as sufficient to permit an inference that some amount of Pabco products were at Todd or Willamette during the time of King's employ, the evidence is wholly inadequate to support the conclusion that King was exposed to Pabco. It would be unreasonable to infer that King was exposed to Pabco asbestos products which were only incidentally used at the sprawling shipyards.

## DISPOSITION

The judgment is reversed as to Robert Lineaweaver and the matter remanded for retrial. The judgment is affirmed as to Floyd King and Ralph Ward. All parties to bear their own costs on appeal.

Stein, J., concurred.

**NEWSOM, J.,** Concurring.—The majority opinion adopts the following standard for determining whether exposure to a defendant's product is a substantial factor in causing an asbestos-related disease: "is there a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to plaintiff's injury." The phrase, "reasonable medical probability," derives from a line of medical malpractice cases.

As Witkin observes, "In a medical malpractice case, the evidence must be sufficient to allow the jury to infer that, in the absence of the defendant's negligence, there was a *reasonable medical probability* that the plaintiff would have obtained a better result." (6 Witkin, Summary of Cal. Law (9th ed. 1988) § 967 p. 357; see also *Duarte* v. *Zachariah* (1994) 22 Cal.App.4th 1652, 1658 [28 Cal.Rptr.2d 88]; *Bromme* v. *Pavitt* (1992) 5 Cal.App.4th 1487, 1498 [7 Cal.Rptr.2d 608]; *Dumas* v. *Cooney* (1991) 235 Cal.App.3d 1593, 1603 [1 Cal.Rptr.2d 584].)

Although the standard of "reasonable medical probability" was adopted in one decision involving a carcinogenic pharmaceutical (*Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456]), it represents a new approach to causation in asbestos cases, and one which finds no close precedent in other jurisdictions. The language is poorly suited to this area of litigation, which is marked by formidable problems of proof because of the delayed onset of symptoms and the typical industrial environment involving multiple exposures to various asbestos products over a period of time. An injured plaintiff's case against a particular supplier commonly rests on vague and fading memories and more or less tenuous circumstantial evidence. A standard requiring "reasonable medical probability" threatens to raise unreasonable practical obstacles to the plaintiff's prospects of recovery. In the case at bar, I do not think Lineaweaver presented evidence satisfying such a standard.

The majority opinion, however, modifies the standard by requiring only a reasonable medical probability "that the defendant's conduct contributed to plaintiff's injury." This language seems to me confusing and perhaps somewhat circular. One may well ask: does any contribution suffice? will a slight or negligent contribution be enough? The most plausible answer appears to be that the contribution must be a "substantial factor" in causing the disease. In inquiring what is a substantial factor, we are led back to the original formula. The modifying language thus makes the effect of the standard very uncertain. As modified, the medical malpractice standard may, in fact, lead to a more relaxed standard of proof than would apply under traditional formulations relating to causation.

A further reading of the majority opinion suggests that the modifying language may be intended merely to allude to possible allocation of damages. The opinion states: "Plaintiffs are free to demonstrate that asbestos diseases are cumulative in nature, with many separate exposures contributing to their injuries. . . . Defendants would not escape liability simply because the precise contribution of each exposure to the disease cannot be determined, but they would be entitled to limit damages assessed against them if they proved the harm was capable of apportionment among them."

I do not think, however, that the allocation of damages entirely obviates the need for a meaningful and practical standard of causation in asbestos cases. An unworkable standard may bar meritorious cases or encourage jury verdicts based on miniscule percentages of fault, an outcome tending to involve speculation and a waste of judicial resources. Moreover, the majority assumes that plaintiffs may be able to prove that asbestos disease is "cumulative in nature." The evidence regarding asbestosis in the present case indeed supports this assumption; the disease was described as resulting from a progressive scarring of the lungs. But cases involving mesothelioma—the fatal cancer which is the other principal asbestos-related disease—will involve quite different testimony. I do not think we can easily assume that this disease reflects the cumulative impact of exposure to asbestos fibers over time, though the odds of contracting it may go up with increased exposure. In any event, the courts should not invoke scientific assumptions of this kind in justifying a rule of general application.

The proof of causation remains very difficult in asbestos litigation because of the long latency of asbestos-related disease and the industrial setting which commonly involves multiple suppliers of asbestos products. In my view, the difficulties are not resolved by importing a standard used in the very different context of medical malpractice. California law points instead toward an adaption of the burden-shifting rule of *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91](hereafter *Summers*). This approach is favored by the two state precedents most closely in point, *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 598-599 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061] and *Pereira* v. *Dow Chemical Co.* (1982) 129 Cal.App.3d 865 [181 Cal.Rptr. 364], and by a persuasive and scholarly federal decision, *Menne* v. *Celotex Corp.* (10th Cir. 1988) 861 F.2d 1453.)

Any discussion of burden-shifting must begin with the general principles of causation in products liability cases. California has now definitively adopted the substantial factor test of Restatement Second of Torts section 431. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1052 [1 Cal.Rptr.2d 913, 819 P.2d 872]; *Doupnik* v. *General Motors Corp.* (1990) 225 Cal.App.3d 849, 860 [275 Cal.Rptr. 715].) For purpose of product liability, "[a] cause of injury is something that is a substantial factor in bringing about an injury." (BAJI No. 3.76; *Endicott* v. *Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 926 [141 Cal.Rptr. 95, 9 A.L.R.4th 481].) A corollary to this principle is that plaintiffs must prove that products supplied by the defendant were a substantial factor in producing their injury. (*Sindell* v. *Abbott Laboratories*, *supra*, 26 Cal.3d 588, 597-598; *Garcia* v. *Joseph Vince Co.* (1978) 84 Cal.App.3d 868 [148 Cal.Rptr. 843].)

The term "substantial factor" is not subject to any useful definition; it may only be contrasted with something that is "a slight, trivial, negligible, or

theoretical factor in producing a particular result." (Com. to BAJI No. 3.76 (1992 rev.).) But in the field of asbestos litigation, judicial precedents suggest an analytical approach to the question whether exposure to a particular product was a substantial factor in producing the plaintiff's injury. We look primarily to federal decisions for guidance since the bulk of litigation has occurred in federal courts. A review of the case law reveals the necessity of first considering the threshold question of whether the plaintiff was subject to a legally significant exposure to asbestos fibers derived from defendant's product.

To prove the requisite exposure to a defendant's product, a plaintiff must show "that [the] defendant's asbestos-containing product was used at the job site and that the plaintiff was in proximity to that product at the time it was being used." (*Odum* v. *Celotex* (11th Cir. 1985) 764 F.2d 1486, 1488.) Where the plaintiff works in a large industrial establishment, such as a shipyard or refinery, it is not enough to show "that the asbestos manufacturer's product was present somewhere at his place of work." (*Roberts* v. *Owens-Corning Fiberglas Corp.* (W.D.Mich. 1989) 726 F.Supp. 172, 174; *Robertson* v. *Allied Signal, Inc.* (3d Cir. 1990) 914 F.2d 360, 378; *Jackson* v. *Anchor Packing Co.* (8th Cir. 1993) 994 F.2d 1295, 1305-1309.) The plaintiff must present "evidence showing that he worked in the same area as the witnesses who [can] identify the asbestos products." (*Roehling* v. *Nat. Gypsum Co. Gold Bond Bldg.* (4th Cir. 1986) 786 F.2d 1225, 1228.)

Thus, in *Blackston* v. *Shook & Fletcher Insulation Co.* (11th Cir. 1985) 764 F.2d 1480, the court affirmed a summary judgment for a contracting company which had installed insulation at a paper mill where the plaintiff worked. The plaintiff, a pipefitter, could show that he worked at the mill at the time the defendant performed some insulating work and that he sometimes worked in proximity to insulators but he could not show whether "those insulators were employed by [the defendant] or whether they were using asbestos." (*Id.* at p. 1482.)[1]

If the plaintiff can make the threshold showing of exposure, other considerations become relevant to the question whether the exposure was a substantial factor in producing the plaintiff's injuries. These considerations

---

[1] The opinion does not mention the sort of circumstantial evidence that often may establish a likelihood that a defendant's product was present at a plaintiff's work site. Apparently there was no such circumstantial evidence. In this respect, the facts can be distinguished from those presented by Lineaweaver's case.

include (a) the frequency and duration of plaintiff's exposure to the defendant's product,[2] (b) the intensity of exposure to the product,[3] (c) the type of asbestos product to which the plaintiff was exposed,[4] and (d) the type of injury suffered by the plaintiff.[5] "Ultimately, the sufficiency of the evidence of causation will depend on the unique circumstances of each case. Nevertheless, the factors listed above are matters which trial courts should consider when deciding if the evidence is sufficient to take such cases to the jury." (*Lockwood* v. *AC & S, Inc.* (1987) 109 Wn.2d 235 [744 P.2d 605, 613], hereafter *Lockwood.*)

A few decisions have tended to require particularized proof of injurious exposure to defendant's products, involving direct identification of the plaintiff as having been exposed to the product of a particular defendant. *Blackston* v. *Shook & Fletcher Insulation Co., supra,* 764 F.2d 1480, is often cited for this requirement. (See also *Jackson* v. *Anchor Packing Co., supra,* 994 F.2d 1295, 1310; *Hyde* v. *Owens-Corning Fiberglas Corp.* (D.C.Ariz. 1990) 751 F.Supp. 832.) Although the *Blackston* decision appears correctly decided on its facts, I would reject this standard of proof. As stated in *Roehling* v. *Nat. Gypsum Co. Gold Bond Bldg., supra,* 786 F.2d 1225, "Such burden is unreasonable. Roehling should not be required to remember product names some thirty years later when he had been a pipefitter, breathing the dust, not handling the products. Such requirement would, in essence, destroy an injured bystander's cause of action for asbestos exposure. Rarely would bystanders take note of names of materials used by others. Moreover, the witnesses should not be required to know Roehling. . . . Bystanders often go unrecognized, but still receive injuries." (*Id.* at p. 1228.)

Ordinarily the courts allow a plaintiff to "rely on the testimony of witnesses who identify manufacturers of asbestos products which were then present at his workplace." (*Lockwood, supra,* 744 P.2d at p. 612; *In re Hawaii Federal Asbestos Cases* (9th Cir. 1992) 960 F.2d 806, 817.) We quote

---

[2]Though it applies a standard, in my view, that is unduly strict, the much-cited decision, *Lohrmann* v. *Pittsburgh Corning Corp.* (4th Cir. 1986) 782 F.2d 1156, 1162-1163, properly addresses the issue of frequency of exposure.

[3]The significance of the intensity of exposure is often recognized implicitly in the statement of facts. (See *Johnson* v. *Celotex Corp.* (2d Cir. 1990) 899 F.2d 1281, 1284.) Conversely, in *Gideon* v. *Johns-Manville Sales Corp.* (5th Cir. 1985) 761 F.2d 1129, 1144, the court reversed a judgment against a defendant because the plaintiff could prove "only slight contact" with its product.

[4]See *Lockwood, supra,* 744 P.2d at page 613.

[5]A potentially injurious level of exposure may not be the same for cases of mesothelioma and asbestosis. Accordingly, decisions finding evidence of causation in suits of mesothelioma victims (e.g., *O'Brien* v. *National Gypsum Co.* (2d Cir. 1991) 944 F.2d 69; *Hoffman* v. *Allied Corp.* (11th Cir. 1990) 912 F.2d 1379) should be viewed with caution as precedents in asbestosis cases.

again from the *Roehling* decision: "The evidence, circumstantial as it may be, need only establish that Roehling was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled." (*Roehling* v. *Nat. Gypsum Co. Gold Bond Bldg.*, *supra*, 786 F.2d at p. 1228.)

Some cases rely on evidence of " 'fiber drift' " "to widen the area of probable exposure" to a defendant's product. (*Jackson* v. *Anchor Packing Co.*, *supra*, 994 F.2d 1295, 1303.) Expert testimony has been used to show that asbestos fibers "hang in the air" and drift with "air currents, thus spreading over time throughout a working area." (*Lockwood*, *supra*, 744 P.2d at p. 611; *Robertson* v. *Allied Signal, Inc.*, *supra*, 914 F.2d 360, 372-373, 383.) Other cases dispense entirely with evidence of where a product was used by merely requiring proof that it was in general use at an industrial facility. Thus, *Martin* v. *American Petrofina, Inc.* (5th Cir. 1985) 779 F.2d 250 upheld a damage award on evidence that a particular product was used "throughout" an oil refinery. *Slaughter* v. *Southern Talc Co.* (5th Cir. 1991) 949 F.2d 167 holds that evidence that a product was "all over" pipes at a tire plant was sufficient to withstand a motion for summary judgment. Similarly, *In re Brooklyn Navy Yard Asbestos Litigation* (2d Cir. 1992) 971 F.2d 831, 837, upheld judgments against multiple defendants on evidence that "asbestos-containing products made by the defendants were used interchangeably throughout the shipyard, and that the environment was extremely dusty with asbestos fibers."

In *Slaughter* v. *Southern Talc Co.*, *supra*, 949 F.2d 167, 172, the court explained the justification for such circumstantial proof of exposure: "The essence of plaintiffs' proof of exposure, like the theories of exposure upheld in the cases summarized above, rests on the common sense idea that, if defendants' products are *likely* to be present at a specific location within the workplace, plaintiffs are likely to have been exposed to the products if they worked near those specific locations, even without explicit testimony that the plaintiff worked near the specific product. This is an intuitively plausible theory of exposure, accepted repeatedly by this court and also by other courts."

But circumstantial evidence does not avoid difficult problems of proof of causation in asbestos litigation. In response to these problems, a few courts have abandoned traditional principles of causation by equating any evidence

of exposure to proof of injury.[6] I see no justification for this approach under California law. As in other products liability cases, liability should not be based on speculation (Evid. Code, § 600, subd. (b); *Traxler* v. *Thompson* (1970) 4 Cal.App.3d 278, 288 [84 Cal.Rptr. 211]), surmise (*Anjeski* v. *Keene Bldg. & Development Co.* (E.D.Mich. 1989) 727 F.Supp. 331, 333), or a mere possibility. (*Jones* v. *Ortho Pharmaceutical Corp.*, *supra*, 163 Cal.App.3d 396, 402.)

The proof of causation in asbestos litigation can best be handled by an adaptation of the burden-shifting rule of *Summers*. In this famous case, two quail hunters negligently fired shots, more or less simultaneously, in the plaintiff's direction. A pellet struck his eye, causing serious injury. Under the circumstances, it could not be determined whose shot caused the injury. Quoting from Dean Wigmore on a related issue, the Supreme Court noted ' "the practical unfairness of denying the injured person redress simply because he cannot prove how much damage each did, when it is certain that between them they did all . . . .' " (33 Cal.3d at pp. 85-86.) To avoid this unfairness, the court held that the burden of proof shifted to the defendants to prove they did *not* cause the damage. The court reasoned, "[t]hey are both wrongdoers—both negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can." (*Id.* at p. 86.)

Unlike the hunting incident, asbestos litigation involves "a concurrent cause situation where more than one defendant is thought to have caused the harm, i.e., substantially contributed to it." (*Menne* v. *Celotex Corp.*, *supra*, 861 F.2d 1453, 1466.) But the principle enunciated in *Summers* is equally applicable. In *Menne* v. *Celotex Corp.*, *supra*, 861 F.2d at 1466, the court observed, "As the number of wrongdoers mounts . . . it becomes increasingly difficult to demonstrate each's substantial contribution to the whole." (*Id.* at p. 1466, fn. 19.) Applying the principles of *Summers*, the *Menne* court adopted a rule shifting the burden to the defendant to prove its contribution was not a substantial factor in causing the harm. The court explained, "Shifting the burden seems at least as fair where *some*, if not all, defendants are shown to have contributed *some* of the harm as where only *one* of them is thought to have caused *all* the harm: in the former situation a liable defendant will be shown at least to have actually caused *some* harm; in the latter a defendant who is entirely innocent of causing any of the . . . injury can be found liable." (*Id.* at p. 1467.)

In *Pereira* v. *Dow Chemical Co.*, *supra*, 129 Cal.App.3d 865, 873, this court applied the burden-shifting rule of *Summers* to facts that cannot be

---

[6]E.g., *Ingram* v. *Acands, Inc.* (9th Cir. 1992) 977 F.2d 1332. While *Lockwood* provides an insightful analysis of factors relevant to causation, the actual holding also comes close to equating evidence of any exposure to proof of causation.

meaningfully distinguished from the present case. There, the plaintiff developed a kidney disorder after experiencing cumulative exposure to solvents supplied by four defendants over a period of five years. The trial court granted summary judgment for failure to establish causation. In reversing the judgment, we stated, "Under the circumstances, it is not plaintiffs' duty to identify which of the vapors caused or contributed to the chronic renal failure but, rather, it is the duty of the defendants who supplied Midcor with their products to prove the contrary." (*Id.* at p. 873, citing *Summers*, *supra*, at pp. 85-86.)

Similarly, *Sindell* v. *Abbott Laboratories*, *supra*, 26 Cal.3d 588, adapted the *Summers* rule to a novel situation in which the plaintiff could not prove which manufacturer supplied a drug for prenatal care which caused injuries to her daughter many years later. The court held that "[e]ach defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused plaintiff's injuries." (*Id.* at p. 612.) While the *Sindell* remedy is not directly applicable here, the decision is a precedent for adapting and extending the principle of *Summers* to resolve the dilemmas of a complex industrial society.

The *Menne* decision adopts a cautious approach to the threshold issue of exposure. Before the burden of proof will shift to the defendant, the plaintiff must establish a "threshold level of factual connection" with defendant's product and his injury. (*Menne* v. *Celotex Corp.*, *supra*, 861 F.2d 1453, 1466.) The defendants must "be shown to have each contributed some harm at a *possibly substantial level* . . . ." (*Ibid.*, italics added.) The court explained, "Where . . . a defendant can be shown actually to have exposed a plaintiff to visible, and hence unsafe, levels of asbestos dust, some harm has occurred . . . . And where frequent or extended exposure cannot be ruled out, the harm may have been substantial." (*Ibid.*)

Applying Nebraska law, the *Menne* court holds that "proof of actual exposure . . . to visible asbestos dust from a defendant's products, within a time period relevant to the acquisition of the injury, and under circumstances where the exposure *could have been extensive enough to produce substantial harm*, establishes a prima facie case of substantial causation against that defendant. Under these conditions . . . Nebraska law would then require that defendant to prove the exposure was unlikely to have been frequent or long enough to be a substantial factor in causing [the plaintiff's injury]." (861 F.2d at p. 1468, italics added.)

The *Summers* rule, as applied in *Menne* v. *Celotex Corp.*, *supra*, 861 F.2d 1453, offers a means of resolving the dilemmas of proving causation in

asbestos litigation in a manner consistent with California precedents. The threshold issue of whether exposure has contributed harm at a possibly substantial level should be determined in light of the medical evidence before the court. The shifting of the burden of proof does not have the effect of attenuating the standard of legal cause, as in cases such as *Ingram* v. *Acands, Inc., supra*, 977 F.2d 1332, and *Lockwood*. The question for the jury remains whether exposure to asbestos derived from defendant's product was a substantial factor in bringing about the plaintiff's injury. The question should be determined in the ordinary sense of the term "substantial factor," taking into account the considerations discussed above relating to frequency of exposure, intensity of exposure, the type of product, and the nature of the injury.

Turning to the issue on appeal—whether the trial court erred in ordering the judgments of nonsuit—I would in the end reach the same results as the majority opinion and therefore find it unnecessary to burden this concurring opinion with a separate discussion of the facts.